Joshua W. Carden, SBN 021698
Joshua Carden Law Firm, P.C.
16427 North Scottsdale Road, Suite 410
Scottsdale, AZ 85254
joshua@cardenlawfirm.com
(480) 454-1100
(480) 454-1101 (Fax)
*Attorney for Plaintiff*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Joseph Sorge, | No. 2:17-cv-04518-SMM |
| Plaintiff, | |
| v. | **PLAINTIFF'S RESPONSE TO AND ADDITIONAL STATEMENTS OF FACT IN OPPOSITION TO SUMMARY JUDGMENT** |
| Yelp Inc., | |
| Defendant. | |

1. On June 6, 2016, Plaintiff Joseph Sorge ("Sorge") began working for Yelp as an Associate Account Executive Trainee ("Trainee") at Yelp's Scottsdale, Arizona location. [Declaration of Matthew Susa ("Susa Dec."), ¶ 4, Ex. 1; Declaration of Abby Kennedy ("Kennedy Dec."), ¶ 5, Ex. 2.]

**Response: Admitted.**

2. Sorge's primary responsibility was to build relationships and sell advertising to local business customers. [Susa Dec., ¶ 5, Ex. 1; Joseph Sorge October 18, 2018 Deposition ("Sorge Depo."), p. 40:18-22, Ex. 3.]

**Response: Admitted.**

3. On his first day, Yelp assigned Sorge to a sales team with approximately 10 other Trainees who started on the same day as him. [Susa Dec., ¶ 6, Ex. 1; Sorge Depo., p. 39:18-22, Ex. 3.]

**Response: Admitted.**

4. Sorge and the other members of his sales team reported to Sales Manager Matthew Susa. Sorge met with Susa on a daily basis. [Susa Dec., ¶¶ 7-8, Ex. 1; Kennedy Dec., ¶ 6, Ex. 2; Sorge



Depo., pp. 37:25-38:4, 40:12-17; 43:8-14; 49:7-10, Ex. 3.]

**Response: Admitted.**

5. At the time of Sorge's employment, there were approximately six to eight sales teams on Sorge's sales floor at the Scottsdale location. [Susa Dec., ¶ 9, Ex. 1.]

**Response: Admitted.**

6. As a way of fostering motivation and team unity, sales teams were permitted to select a "team name." [Susa Dec., ¶ 10, Ex. 1; Sorge Depo., p., 41:16-18, Ex. 3.]

**Response: Admitted.**

7. Sales teams were also permitted to select a "team song" that would sometimes play for approximately 10-30 seconds on the sales floor to celebrate sales. [Susa Dec., ¶ 11, Ex. 1; Sorge Depo., pp. 102:18-103:5; 103:21-104:3, Ex. 3.]

**Response: Admitted.**

8. The sales teams' song would not necessarily play every time a sale was made. For some teams, including the "Razz Daddies," the team song would only play once during the day to recognize all the team members' sales for the day. [Susa Dec., ¶ 12, Ex. 1.]

**Response: Denied.  It was played multiple times a day upon the making of a sale.  It was often played during the <u>middle</u> or <u>beginning</u> of the work day.  See Declaration of Joseph Sorge ("Sorge Decl.") at ¶¶ 3, 12-13 & videos (June 14, 15, and 16 video recordings – electronic files will be filed pending the Court granting the Motion for Leave filed herewith.**

9. During the first week of Sorge's employment, he spent a majority of his work time in training and learning Yelp's sales techniques and procedures. [Susa Dec., ¶ 13, Ex. 1; Sorge Depo., pp. 37:17-24; 38:22-24, Ex. 3.]

**Response: Admitted.**

10. Sorge learned about various reports and information that Yelp required Trainees to enter on a daily basis. [Susa Dec., ¶ 14, Ex. 1; Sorge Depo., p. 41:4-15, Ex. 3.]

**Response: Admitted.**

11. In his second week, Sorge continued training classes and also worked on building relationships and making sales to customers. [Susa Dec., ¶ 15, Ex. 1; Sorge Depo., p. 39:2-14, Ex.



3.]

   **Response: Admitted.**

   12. As Sorge began to focus on sales, Susa observed that Sorge repeatedly failed to follow specific techniques and procedures required by Yelp. [Susa Dec., ¶ 16, Ex. 1]

   **Response: Denied. Sorge was following the techniques and procedures required as he best understood them during the first week he was permitted to make sales. Sorge Decl. ¶ 26.**

   13. On June 14, 2016, Susa met with Sorge to coach him on the importance of following Yelp processes. [Susa Dec., ¶ 17, Ex. 1; Sorge Depo., pp. 45:15-19, 47:16-18, Ex. 3.]

   **Response: Admitted.**

   14. One of the areas where Sorge failed to follow procedures was Yelp's process for approaching each business account with five "touches," or communications, from the responsible sales person. Susa followed up their conversation with an email. [Susa Dec., ¶¶ 17-18, Ex. 1; Sorge Depo., pp. 43:21-45:19; 48:20-49:10, Ex. 3.]

   **Response: It is denied that Sorge "failed" to follow procedures; the deposition testimony provided by Defendant reveals that Mr. Sorge was concerned about harassment in violation of FTC rules.  Defendant's Statement of Facts, Sorge Depo., pp. 45:3-48:14.  It is otherwise Admitted that Sorge and Susa met as indicated.**

   15. Also on June 14, 2016, Susa observed that Sorge had repeatedly failed to complete Yelp's daily sales metrics document. [Susa Dec., ¶¶ 19, Ex. 1.]

   **Response: Objection to the vague, conclusory, and exaggerated word "repeatedly." This was literally Sorge's first week of actually trying to make sales and Sorge denies that he was "failing repeatedly" and alleges that he was one of the better performers on his team based on the posted metrics available for all team members to see. Sorge Decl. ¶¶ 22-29.**

   16. This document required Trainees to enter their individual data including calls made and appointments set. [Susa Dec., ¶ 20, Ex. 1; Sorge Depo., p. 52:1-17, Ex. 3.]

   **Response: It is admitted that this action was required, however, Sorge denies that he understood before that point that the particular document (one of many in different systems**



**– Sorge Depo. 52:1-7) needed to be "real time" updated. Sorge Decl. ¶ 28. In fact, from what Sorge understood from working with his peers, many of them would wait until the end of the day to update their documents. *Id*.**

17. Despite that Sorge received multiple verbal reminders and calendar invites from Susa, he failed to enter the required data three times in a row, including the including the end-of-day on June 13, 2016, and lunch time and end-of-day on June 14, 2016. [Susa Dec., ¶ 21, Ex. 1; Sorge Depo., pp. 49:25-50:23; 53:2-54:10, Ex. 3.]

**Response: Admitted.  Note however that Susa claimed to have only observed this "failure" for the <u>first time</u> on June 14 (See Statement of Fact No. 15), and therefore no reasonable inference exists that Susa had been correcting Sorge all along for any alleged failures.**

18. Susa asked Sorge if there was anything getting in the way of him completing this task. Sorge could not recall any specific reason why he wasn't completing the metrics document but acknowledged that there were a number of tasks that were supposed to be completed daily. [Susa Dec., ¶ 22, Ex. 1; Sorge Depo., pp. 50:19-51:9, Ex. 3.]

**Response: Admitted.**

19. Susa requested that Sorge reply back "good to go" acknowledging that he read the email and was committed to completing the daily task. On June 15, 2016, Sorge responded "good to go." [Susa Dec., ¶ 22, Ex. 1; Sorge Depo., p. 51:10-25, Ex. 3.]

**Response: Admitted.**

20. Despite Susa's attempts to coach Sorge, he failed to demonstrate improvement. [Susa Dec., ¶ 24, Ex. 1.]

**Response: Denied. Mr. Sorge was not given any reasonable opportunity to improve after coaching as he spent the next morning (June 16) in a meeting with Susa and Kennedy (Statement of Fact No. 23), the next afternoon (June 16) in a team-wide training (Statement of Fact No. 31); and the next morning (June 17) being terminated by Susa (Statement of Fact No. 46; see also Sorge Decl. ¶¶ 17 & 33).**

21. On June 15, 2016, Susa reached out to his direct supervisor, Senior Sales Manager Abby



Kennedy, to discuss Mr. Sorge's repeated failures to follow Yelp's processes and procedures and his failure to improve. [Susa Dec., ¶ 25, Ex. 1; Kennedy Dec., ¶¶ 4; 7, Ex. 2.]

**Response: Admitted.  Note that this is the <u>first time</u> in the record that Mr. Susa is asking for permission to provide a "coach-out" to Mr. Sorge, which would lead to the reasonable inference that Mr. Susa did not perceive his previous conversations with Mr. Sorge to be anything other than routine training.**

22. They that Sorge failed to record his customer vetting notes or update his vetting list. Susa also discussed that Sorge failed to update his daily metrics document. [Susa Dec., ¶¶ 26-27, Ex. 1; Kennedy Dec., ¶¶ 8-9, Ex. 2.]

**Response: Objection to the lack of a verb in the first sentence rendering the sentence vague. It is admitted only that the attached emails were sent.**

23. On the morning of June 16, 2016, Kennedy joined Susa for a coaching session with Sorge. She was very troubled by what she observed. [Susa Dec., ¶ 28, Ex. 1; Kennedy Dec., ¶ 10, Ex. 2; Sorge Depo., p. 55:7-12, Ex. 3.]

**Response:  It is admitted that Kennedy and Susa coached (not disciplined) Sorge for the very first time together on the morning of June 16, 2016. It is counter-alleged that Mr. Sorge was also very troubled at the time by being blasted by an offensive song several times each day during the previous several days. Sorge Decl. ¶¶ 1-7.**

24. They discussed Sorge's failure to complete the metrics document on a daily basis and his failure follow Yelp's procedure for vetting of potential clients. [Susa Dec., ¶ 29, Ex. 1; Sorge Depo., pp. 55:14-22; 56:3-57:25, Ex. 3.]

**Response: Admitted.**

25. At the time of the meeting, Sorge believed that he was among the highest performers on his sales team, especially with respect to measured metrics including his appointment schedule, calls made to customers, and talk time with customers. [Sorge Depo., pp. 55:23-56:2, Ex. 3.]

**Response: Admitted.  Sorge based this belief on the posted metrics up on the board and discussions with other team members as to their current metrics. Sorge Decl. ¶¶ 29-31 & Ex. A.  Note also the "your wife on the futon" song lyric from the offensive song posted**



on the whiteboard.  **Sorge Decl., Ex. A.**

26. Sorge told Kennedy and Susa that in his opinion, his actual metrics put him in the top half to 75 percent of his team in terms of production. [Sorge Depo., pp. 68:19-22; 69:25-70:11, Ex. 3.]

**Response: Admitted. Sorge based this belief on the posted metrics up on the board and discussions with other team members as to their current metrics. Sorge Decl. ¶¶ 28-31**

27. Sorge said he was the "best" sales person in his sales class. [Susa Dec., ¶ 33, Ex. 1; Kennedy Dec., ¶ 14, Ex. 2.]

**Response: Denied. Sorge said he was the "most experienced" sales person in his sales class, based on his discussions with other team members about their previous phone sales experience. Sorge Decl. ¶ 30.**

28. Throughout the session, Sorge acted disrespectfully and resistant to Kennedy and Susa's coaching. They observed that Sorge laughed, interrupted them, and referred to Yelp's procedures as "you guys and your practices." [Susa Dec., ¶¶ 30-31, Ex. 1; Kennedy Dec., ¶ 11-12, 15, Ex. 2.]

**Response: Denied.  Sorge believe the interaction to be otherwise congenial and certainly may have laughed during the conversation, but not disrespectfully.  No written warning or other form of disciplinary action was given to Mr. Sorge at this meeting.  Sorge ¶ 31.**

29. Sorge also asked Susa why Kennedy was present for the meeting and said he would prefer that she not be present for future meetings. [Susa Dec., ¶ 32, Ex. 1; Kennedy Dec., ¶¶ 13; 16, Ex. 2.]

**Response: Denied. Sorge did not say this.  Sorge Decl. ¶¶ 32.  Sorge was aware that she was a training manager. Def's SOF, Sorge Depo. at 54:23 – 55:3.**

30 Following the meeting, Kennedy summarized her observations for Senior Manager Marla Castaneda and sought her insight. [Kennedy Dec., ¶ 16, Ex. 2.]

**Response: It is admitted only that the email was sent.  Note that Ms. Kennedy does <u>not</u> reference any disrespectful behavior by Mr. Sorge in the email, and further does <u>not</u>**



1  **acknowledge that Sorge spent the rest of that work day in a training session as discussed in**
2  **Statement of Fact ¶ 31.  The idea that Mr. Sorge had "failed to follow through" was**
3  **inaccurate as Mr. Sorge was in a training all afternoon by the Defendant's own timeline.**

4  31. Following his coaching session with Susa and Kennedy, on the afternoon of June 16,
5  2016, Sorge attended a training meeting during which a Sales Director for the Scottsdale location,
6  Heyward McAlpin, gave a presentation. Kennedy also attended the meeting. [Kennedy Dec., ¶¶
7  17-18, Ex. 2; Sorge Depo. p. 77:1-6, Ex. 3.]

8  **Response:  Admitted.  <u>Note that shortly before this meeting is when Mr. Sorge</u>**
9  **<u>complained to Mr. Susa about the offensive song</u>. Sorge Decl. ¶ 14**

10  32. While McAlpin, was speaking, Kennedy observed Sorge slouching in his chair, leaning
11  back from the table, putting his head down, and generally appearing to ignore McAlpin's
12  presentation. Sorge also did not take notes during the presentation. [Kennedy Dec., ¶¶ 19-20, Ex.
13  2.]

14  **Response: This was a room full of at least 60 people and Mr. Sorge was near the back**
15  **while Ms. Kennedy sat near the front. Sorge Decl. ¶¶ 17-21. Sorge denies "ignoring" the**
16  **presentation and was able to fully recount the presentation during the termination meeting**
17  **the following day. Sorge Decl. ¶ 38. Note taking was not required during the presentation.**
18  **Sorge Decl. ¶ 20.**

19  33. After the presentation McAlpin also told Kennedy that he noticed Sorge's disrespectful
20  behavior. [Kennedy Dec., ¶ 21, Ex. 2.]

21  **Response: Objection, hearsay.  Out of court statement by McAlpin being offered by**
22  **the alleged hearer Kennedy for its truth.  Furthermore, Sorge had never seen or met McAlpin**
23  **(Sorge Decl. ¶ 21) and so it would have been impossible for McAlpin to particularly notice**
24  **"Sorge's" allegedly disrespectful behavior in the back of the room (Sorge Decl. ¶ 18).**
25  **Additionally, Sorge notes that he was particularly disturbed as he had just reported the**
26  **offensive song as a violation of Yelp's policy to Susa and had his concerns summarily**
27  **dismissed by Susa. (Sorge Decl. ¶¶ 15-16, 22-23.)**

28  34. At the conclusion of the training session, at approximately 4:10 p.m., Sorge exited the



1  building through the entry doors, passing the area where interview candidates usually wait. [Sorge
2  Depo., p. 83:9-11, Ex. 3.]

3  **Response: Admitted.**

4  35.  While walking past the front desk area, Sorge said to Facilities Coordinator Randall
5  Meagher, who Sorge evidently believed was an interview candidate: "Run while you can dude."
6  [Susa Dec., ¶ 35, Ex. 1; Kennedy Dec., ¶ 22, Ex. 2; Declaration of Randall Meagher ("Meagher
7  Dec."), ¶ 4-6, Ex. 4; Declaration of Heather Webb ("Webb Dec."), ¶ 5, Ex. 5.]

8  **Response: Denied.  Sorge did not say this or words to that effect.  Sorge Decl. ¶ 24.**

9  36.  On the afternoon of June 16, 2016, Meagher, along with his supervisor, Carmine
10  Verderame, reported his observation to Kennedy. [Kennedy Dec., ¶ 22, Ex. 2.]

11  **Response: Objection, hearsay.  Out of court statements by Meagher and Verderame**
12  **being offered by the alleged hearer Kennedy for their truth.  The underlying statement is**
13  **denied. Sorge Decl. ¶ 24.  Note that Yelp offers no explanation as to why it was unable to**
14  **obtain declarations from the speakers Meagher or Verderame.  Furthermore, Yelp did not**
15  **disclose Verderame as a witness in its Disclosure Statement. Sorge Decl. ¶ 46, Ex. D (Third**
16  **Supplemental Disclosure Statement).**

17  37.  Meagher or Verderame also told Kennedy that Receptionist Heather Webb had
18  witnessed the incident. Kennedy spoke with Webb who corroborated Meagher's account of the
19  incident and said that Security Specialist Amber Sutton also witnessed the incident. [Kennedy
20  Dec., ¶ 23, Ex. 2; Webb Dec, ¶¶ 4-5; 8-9, Ex. 5.]

21  **Response: Objection, hearsay.  Out of court statements by Meagher and Verderame**
22  **being offered by the alleged hearer Kennedy for their truth.  Objection to Webb's declaration**
23  **also as hearsay and without foundation or personal knowledge as to beliefs of others.  Sorge**
24  **denies making the comment. Sorge Decl. ¶ 24.**

25  38.  Webb told Kennedy that she assumed Sorge made the comment to Meagher because
26  he believed that Meagher was an interview candidate. [Kennedy Dec., ¶ 24, Ex. 2; Webb Dec.,
27  6, Ex. 5.]

28  **Response: Objection, hearsay; foundation.   Out of court "assumption" by Webb**



1  **being offered by the alleged hearer Kennedy for their truth.   Sorge denies making the**
2  **comment.  Sorge Decl. ¶ 24.**

3  39. Kennedy immediately informed Susa and McAlpin of Meagher and Webb's account of
4  Sorge's statement. [Susa Dec., ¶¶ 34-36, Ex. 1; Kennedy Dec., ¶ 25, Ex. 2.]

5  **Response: Objection, Hearsay. Sorge denies making the comment. Sorge Decl. ¶ 24.**

6  40. Kennedy and Susa discussed Sorge's behavior during the past week, including their
7  concerns over his disrespectful treatment of supervisors and failure to implement coaching, as well
8  as this most recent incident. [Susa Dec., ¶¶ 37-40, Ex. 1; Kennedy Dec., ¶ 26, Ex. 2.]

9  **Response: Objection, Hearsay.  It is also a reasonable inference here that Susa**
10 **considered Sorge's complaint over the offensive song to be additional "disrespectful"**
11 **treatment of supervisors.**

12 41. Based on these ongoing concerns, Kennedy and Susa recommend termination of
13 Sorge's employment to McAlpin. McAlpin approved the termination that evening. [Susa Dec., ¶
14 41, Ex. 1; Kennedy Dec., ¶¶ 27-28, Ex. 2.]

15 **Response:  Admitted.  Note Susa's direct involvement in the termination process.**

16 42. Yelp also obtained written statements from Meagher, Webb, and Sutton detailing their
17 firsthand account of Sorge commenting "run while you can," as well as security video footage
18 showing Sorge exiting the building and walking past Meagher, Webb, and Sutton. [Kennedy Dec.,
19 ¶¶ 30-31, Ex. 2; Meagher Dec., ¶ 9, Ex. 4; Webb Dec., ¶ 10, Ex. 5.]

20 **Response:  Objection, immaterial – this does not render this any less of a disputed fact**
21 **issue.  Note that the security footage does not actually depict Sorge saying anything to**
22 **anyone. Sorge denies making the comment. Sorge Decl. ¶ 24.**

23 43. Sorge admits that the security video footage shows him exiting the building. [Sorge
24 Depo., p. 83:9-11, Ex. 3.]

25 **Response: Admitted.**

26 44. Sorge did not personally know Meagher, Webb, or Sutton. [Sorge Depo., pp. 85:9-11;
27 86:8-9; 89:2-8, Ex. 3; Webb Dec. ¶ 7; 11, Ex. 5; Meagher Dec. ¶ 8; 10, Ex. 4.]

28 **Response: Objection, immaterial. Otherwise admitted.**



1  45. Though he denies that he said "run while you can" or words to that effect to Meagher,
2  he admits that he has no idea as to why Meagher, Webb, and Sutton would make inaccurate
3  statements about him. [Sorge Depo., p. 89:9-19, Ex. 3.]

4      **Response: Admitted.**

5      46. On the morning of June 17, 2016, Susa and Human Resources representative, Nicole
6  Berger, met with Sorge. They informed him that his employment was terminated, effective
7  immediately, because of his unprofessional and disrespectful conduct and failure to demonstrate
8  improvement in following Yelp's processes and procedures, despite Susa's coaching on these
9  issues. [Susa Dec., ¶¶ 42-43, Ex. 1; Sorge Depo., p. 72:11-16, Ex. 3.]

10     **Response: It is admitted that this is what Susa stated during the meeting.**

11     47. Specifically, Susa told him that after their coaching session on June 16, 2016, Sorge
12 displayed disrespectful behavior during a presentation by McAlpin including slouching in his
13 chair, not taking notes, and generally appearing disengaged from the presentation. [Susa Dec., ¶¶
14 44; 52, Ex. 1; Sorge Depo., pp. 73:6-10; 77:22-78:11, Ex. 3.]

15     **Response:  Denied. Susa initially claimed to have personally seen Mr. Sorge engaging
16 in disrespectful conduct; Mr. Sorge reminded Susa that Susa did not actually attend the
17 meeting.  Susa backpedaled and then admitted that someone else (unidentified) had told him
18 this.  There was no note-taking required.  At this point, Sorge also informed the HR rep Ms.
19 Berger that he believed this termination to be retaliatory for complaining to Susa about the
20 offensive song lyrics the previous day and also noted Mr. Susa's frequent use of the "F"
21 word when addressing the team. Sorge Decl. ¶¶ 34-41.**

22     48. Susa also referenced Sorge's continued failure to record his customer vetting notes or
23 update his vetting list, which was one of the specific issues they discussed on June 15, 2016. [Susa
24 Dec., ¶¶ 45; 52, Ex. 1; Sorge Depo., p. 79:1-6, Ex. 3.]

25     **Response:  It is denied that any such issues were discussed on June 15 – only the
26 metrics document was discussed by email (Def's SOF, Susa Decl., Ex. C). It is admitted that
27 these issues were discussed with Susa and Kennedy during the morning of June 16 and then
28 the entire afternoon was taken up by a training.  It is further denied that this represented a**

**"continued failure" as Sorge was not permitted to work long enough after his complaint abot the song to Susa to actually implement anything. This termination meeting is taking place in the morning day on June 17. Sorge Decl. ¶¶ 17, 25, 33.**

49. However, they told Sorge that the final reason for his termination was his comment to an individual sitting where interview candidates usually wait to: "Run while you still can." [Susa Dec., ¶¶ 46; 52, Ex. 1; Sorge Depo. p. 73:18-22; 79:7-12, Ex. 3.]

**Response: Admitted that this was stated in the meeting. It is denied that this took place. Sorge Decl. ¶ 24. It is also counter-alleged that the reason given for Sorge's termination was "Not a good Cultural Fit." Sorge Decl. ¶ 45 & Ex. C.**

50. Yelp interpreted this comment as his attempt to discourage a person he apparently believed to be an applicant from working at Yelp. [Susa Dec., ¶ 47, Ex. 1.]

**Response: Objection, Immaterial, foundation, lack of personal knowledge. Susa did not hear the comment and could therefore not "interpret" it in his Declaration. Furthermore, Susa was the individual to whom Sorge complained about the offensive song lyrics and who rejected that complaint and it can therefore be inferred that his interpretation is biased. Sorge Decl. ¶¶ 14-16.**

51. After learning of his termination, Sorge complained that he experienced a "hostile work environment" at Yelp because he found the music played on the sales floor to be "offensive." [Susa Dec., ¶¶ 48-49, Ex. 1; Sorge Depo. pp. 73:24-74:1, Ex. 3.]

**Response: It is denied that this is the first time Sorge made this complaint. Sorge first made this complaint to Susa on June 16, 2016 and was terminated the very next day. Sorge Decl. ¶¶ 14-16, 33-34. During his termination he specifically noted to the HR representative that he had made this complaint on the previous day. Sorge Decl. ¶ 39. Note that Yelp did not submit a declaration from Ms. Berger, the HR rep.**

52. Sorge also complained that Susa used profanity when addressing the sales team. [Susa Dec., ¶ 50, Ex. 1; Sorge Depo. p., 89:20-90:3, Ex. 3.]

**Response: Admitted. He used the F-word frequently in speaking to the sales team. Sorge Decl. ¶ 39.**

53. Sorge then threatened to take legal action against Yelp and said he was going to post negative comments about Yelp on his social media pages. [Susa Dec., ¶ 51, Ex. 1; Sorge Depo., p. 92:13-24, Ex. 3.]

**Response: The first part is Admitted.  The second part is denied; Sorge said he would post "the truth about what happened" at Yelp on his social media pages. Sorge Decl. ¶ 41.**

54. Sorge alleges that Yelp created a hostile work environment by permitting the song "Straight to the Bank," which was one team's "team song," to be played on the sales floor. [Complaint (ECF 1) ¶¶ 16; 35; Sorge Depo., p. 96:2-7, Ex. 3.]

**Response: Admitted. Specifically, Sorge contends that it was played loudly, multiple times a day, every day, as soon as any member of the team completed a sale. Sorge Decl. ¶¶ 1-4.**

55. A sales team named "Razz Daddies" selected "Straight to the Bank" as their team song. [Sorge Depo., p. 102:11-19, Ex. 3.]

**Response: Admitted.**

56. Sorge does not know who on the Razz Daddies team selected the song "Straight to the Bank" or how it was selected. He does not know anyone on the Razz Daddies team, he did not speak with anyone on the Razz Daddies team about the song, and he does not know why they selected the song. [Id., pp. 103:16-20; 108:13-109:1, Ex. 3.]

**Response: Objection, immaterial. Otherwise admitted.**

57. Sorge does not know if the Razz Daddies team picked the song with a discriminatory motive. [Id., p. 109:2-9, Ex. 3.]

**Response: Objection, immaterial. Otherwise admitted.**

58. Sorge alleges that the song contains two lyrics that are "offensive" and "demeaning to women and homosexuals." [Complaint (ECF 1) ¶¶ 16; 35; Sorge Depo., pp. 95:4-25; 123:9-23; 128:1-10; 129:2-4; 130:19-131:1; 131:8-18; 137:12-20, Ex. 3.]

**Response: Admitted.**

59. He alleges that one lyric is offensive to gay people because it contains the word "faggot." [Sorge Depo., pp. 74:2-6; 96:8-18; 98:13-20; 101:1-4; 101:11-14; 102:8-10, Ex. 3.]



1    **Response: Admitted.**

2    60. He alleges that another lyric is offensive to women because it contains the word "bitch"

3    and references a women's menstrual cycle. [Id., pp. 74:15-18; 75:17; 95:4-25; 96:19-21; 99:4-8;

4    126:3-8, Ex. 3.]

5    **Response: Admitted – to be clear that lyric says "Homey you a bitch you got feminine**

6    **ways/heard you got four lips and bleed for seven days." Sorge Decl. ¶ 4.**

7    61. These are the only lyrics he found offensive in the song. [Id., pp. 98:13-99:16, Ex. 3.]

8    **Response: Admitted that the lyrics identified in Statements Nos. 59 and 60 are the**

9    **lyrics he found to be offensive.**

10    62. Sorge is male and does not identify as gay. [Id., p. 31:15-23; 99:17-21; 101:20-22, Ex. 3.]

11    **Response: Objection, Immaterial. Otherwise admitted, and specifically alleged that**

12    **he found the song lyrics to be personally offensive. Sorge Decl. ¶ 5.**

13    63. Sorge alleges that 30 seconds of the song "Straight to the Bank" was played between

14    four and five times a day and 15 and 20 times per day. He did not keep any records of the times he

15    heard the song. [Id., pp. 106: 11-16; 107:16-108:11, Ex. 3.]

16    **Response: Admitted.  Note this allegation by itself creates a factual dispute with**

17    **Statement of Fact No. 8.  It is further alleged that Sorge did record the song three times.**

18    **Sorge Decl. ¶¶ 11-13.**

19    64. Sorge alleges that the lyric containing the word "faggot" is offensive because he has an

20    aunt and uncle who are gay and "friends that are gay." He alleges that this word is offensive to

21    "all [his] friends" and his "family." [Id., pp. 74:13-18; 75:15-17; 96:13-18; 100:2; 100:11-25; 101:1-

22    10, Ex. 3.]

23    **Response: Admitted.**

24    65. Sorge alleges that the word "faggot" is "offensive to most people" and "offensive to

25    everybody." [Id., pp. 101:20-102:7, Ex. 3.]

26    **Response: Admitted.**

27    66. Sorge alleges that if he thought the two lyrics were offensive, then "it's offensive to

28    everybody…", that the word "faggot" "would probably be offensive to most people," and that



13

1  "the reference to women … in regards to their genitalia and how [it is] used in the song would be

2  offensive to women in general…" [Id., pp. 129:8-18; 129:19-130:4, Ex. 3.]

3  **Response: Admitted.  However, it is sufficient for this case that Sorge was reasonably**

4  **offended by these lyrics.**

5  67. Although he "cannot speak for everyone," Sorge thought "in general, most people

6  would find those two words offensive – or those two phrases offensive." [Id., p. 130:3-5, Ex. 3.]

7  **Response: Admitted.**

8  68. Sorge did not ask anyone at Yelp if they were offended by the song. [Id., pp. 122:16-

9  123:3, Ex. 3.]

10  **Response: Objection, immaterial.  Otherwise admitted.  Given Yelp's clear, "no**

11  **tolerance," anti-harassment policy (Sorge Decl. ¶ 44, Ex. B,) Sorge would presumably not**

12  **have needed to ask if anyone at Yelp believed that sexual harassment was wrong or question**

13  **whether the use of gay and sexist slurs in the workplace were wrong either.**

14  69. No one at Yelp complained to Sorge about Straight to the Bank or any of its lyrics. [Id.,

15  p. 120:5-20, Ex. 3.]

16  **Response: Objection, Immaterial. Otherwise, admitted. As Yelp has noted, Sorge was**

17  **a salesperson, not a manager or in human resources.**

18  70. Sorge did not ask any women at Yelp if they found this song or lyric to be offensive. [Id.,

19  p. 126:13-15, Ex. 3; Declaration of Jonel Kejee (Kejee Dec.) ¶ 7, Ex. 6.]

20  **Response: Objection, Immaterial. Note that Ms. Kejee does not claim the song is**

21  **inoffensive. Sorge was embarrassed to working around women while the offensive song was**

22  **playing. Sorge Decl. ¶ 6.**

23  71. Sorge did not know any employees at Yelp who identified as gay. [Sorge Depo., pp.

24  101:15-19; 123:4-8, Ex. 3.]

25  **Response: Objection, Immaterial. Sorge identified that he was personally offended by**

26  **the slurs in the song and offended because he has friends and family who are gay. Sorge Decl.**

27  **¶ 5.**

28  72. Sorge claimed that "everyone" would sing along to "Straight to the Bank" when it



14

1  played on the sales floor. [Id., pp. 104:22-105:5; 120:5-10, Ex. 3.]

2  **Response: Admitted.**

3  73. Sorge does not recall singing along to "Straight to the Bank" but he "probably" could
4  have. [Id., p. 121:15-21, Ex. 3.]

5  **Response: It is admitted that Sorge would mouth or sing the words to the non-**
6  **offensive portions of the song, in the same way that most humans sing along with a song that**
7  **becomes an all-too familiar ear worm.  Sorge Decl. ¶¶ 8-10.**

8  74. Sorge's coworker, Trainee Jonel Kejee, who sat next to Sorge on the sales floor
9  witnessed Sorge singing along to "Straight to the Bank." They sang along to the song together.
10  [Kejee Dec. ¶¶ 6; 11-12, Ex. 6.]

11  **Response: It is admitted that Sorge got to the point where he mouthed <u>some</u> of the**
12  **lyrics (though not the slurs and sexual content) and copied the rapper's ridiculous laugh as**
13  **a coping mechanism. Sorge Decl. ¶¶ 8-10.  Note that in all of her allegations Ms. Kejee never**
14  **suggests that she found the song to be inoffensive.  In fact, nobody at Yelp in the entire record**
15  **alleges that the song is innocuous and inoffensive.**

16  75. Sorge admits that the two lyrics from Straight to the Bank are the only conduct that
17  "created an abusive and hostile working environment" and were the only allegedly unwelcome
18  "sexual misconduct" he experienced at Yelp. [Sorge Depo., pp. 119:10-19; 119:20-120:1; 138:12-
19  19, Ex. 3.]

20  **Response: Admitted that this was the sexualized content that, played multiple times a**
21  **day throughout his employment, created an abusive and hostile working environment and**
22  **was sexual misconduct as prohibited by Yelp' policies. (Sorge Decl. ¶¶ 2-10, 44 & Ex. B)**
23  **that violated Title VII.**

24  76. Sorge admits that no one from Yelp made any sexual or derogatory comments directly
25  to him. [Id., p. 120:2-4, Ex. 3.]

26  **Response: Other than the song and Susa's frequent use of the F word as alleged**
27  **herein, Admitted.**

28  77. Sorge alleges that he told Susa that he told Susa the song was offensive because it was



15

1   "denigrating to homosexuals and women." [Id., p. 128:6-10, Exh. 3.]

2   **Response: Admitted.  It is specifically alleged that he made this complaint midday on**

3   **June 16, shortly after recording the song for the third time. Sorge Decl. ¶ 14.**

4   78. Susa denies that Sorge raised any concerns regarding a "hostile work environment,"

5   offensive music, or Susa's purported use of profanity prior to the termination meeting. [Susa Dec.,

6   ¶¶ 53-54, Ex. 1.]

7   **Response: As to the complaint about the offensive music, <u>this is a material disputed</u>**

8   **<u>fact</u>.  Sorge Decl. ¶¶ 14-16. As to Susa's profane speech, it is admitted that Sorge did not**

9   **bring that up until the termination. Sorge Decl. ¶ 39.**

10   79. Prior to the time of Sorge's termination, Kennedy had no knowledge of any complaints

11   allegedly made by Sorge regarding a song played on the Yelp sales floor, offensive lyrics, or

12   anything related to a concern by Sorge that a song played on the sales floor was offensive to women

13   and gay people. [Kennedy Dec., ¶¶ 32-33, Ex. 2.]

14   **Response: Objection, irrelevant.  Susa was the supervisor and a decision-maker in the**

15   **termination. Given the number of discussions Susa and Kennedy allegedly had, this is**

16   **unlikely to be true, but her denial of this would be a credibility issue for the jury.**

17   80. On June 16, 2016 at approximately 2:01 p.m., Sorge scheduled an interview with a

18   potential employer, Impact Payments Recruiting ("Impact"). The interview was scheduled to

19   occur between 11:00 am and 12:00 pm on June 17, 2016. [Sorge Depo., pp. 151:6-152:2; 152:11-20;

20   153:1-14; 154:22-25, Ex. 3; Ex. 18 to Sorge Depo., Ex. 7.]

21   **Response: Admitted.**

22   81. Sorge held a telephonic interview with Impact on June 17, 2016 and an in-person

23   interview on June 20, 2016. [Sorge Depo., pp. 156:20-157:16, Ex. 3.]

24   **Response: Admitted.**

25   82. Impact offered Sorge employment on June 20, 2016. He accepted the position and

26   began his employment on June 28, 2016. [Id., pp. 157:20-23; 160:6-25, Ex. 3; Ex. 20 to Sorge

27   Depo., Ex. 8.]

28   **Response: Admitted.**



83. Sorge's starting salary at Impact was $40,000, which was higher than his salary of $30,000 at Yelp. [Kennedy Dec., ¶ 34, Ex. 2; Sorge Depo., p. 161:10-18, Ex. 3; Ex. 20 to Sorge Depo., Ex. 8.]

**Response: Admitted.**

84. Sorge voluntarily resigned from Impact effective September 16, 2016. He left Impact on "good terms." [Sorge Depo., pp. 162:23-164:10; 164:19-20, Ex. 3; Ex. 21 to Sorge Depo., Ex. 9.]

**Response: Admitted.**

85. Following Impact, Sorge worked at The Lucas Group for approximately one week, for October 24, 2016 until October 28, 2016. Sorge was involuntarily terminated from The Lucas Group for "poor performance." [Sorge Depo., pp. 167:7-168:20, Ex. 3; TLG000032, Ex. 10.]

**Response: Admitted that this is what the documents say. As he testified, Mr. Sorge called in sick for the Friday at the end of his first week, and was terminated on Monday as "not a good fit." Def's SOF, Sorge Depo. 168: 2-22. If this had happened just 8 months later it would likely have been a presumptive violation of Arizona's Paid Sick Time laws.**

86. Sorge is seeking "lost wages" for eight weeks of work. [Plaintiff's October 12, 2018 First Amended Responses to Interrogatories, No. 8 (Ex. 27 to Sorge Depo.), Ex. 11.] Sorge is unable to identify for which weeks in 2016 he is seeking lost wages. [Sorge Depo., pp. 255:18-256:12, Ex. 3.]

**Response: Controverted slightly. Sorge is seeking 8 weeks of pay for the approximately 8 weeks he was out of work during the 12 months after he worked for Yelp. Sorge Decl. ¶ 42.**

87. Sorge has not sought any treatment, seen any doctors, counselors, or mental healthcare providers with respect to his claim for damages arising from emotional distress. [Sorge Depo., p. 143:14-25, Ex. 3.]

**Response: Admitted.**

88. Sorge spoke with an "old friend," on one occasion regarding "emotional distress. Sorge does not know if she is licensed. He does not recall what was discussed but that they spoke about



"losing jobs" and his "girlfriend at the time." [Id., p. 149:10-21, Ex. 3; Plaintiff's Supp. and Further Resp. to Interrogatories, Resp. to No. 10, Ex. 12.]

**Response: Admitted.**

89. Sorge identifies experiencing stress, embarrassment, racing heart, sweaty palms, and a "sick to my stomach feeling" as the symptoms he experiences as a result of his termination from Yelp. [Sorge Depo., pp. 144:6-146:10; 147:11-24; 247:15-248:5, Ex. 3.]

**Response: Admitted.**

90. Sorge may have experienced headaches, for which he took Tylenol. [Id., pp. 247:15-248:5, Ex. 3.]

**Response: Admitted.**

91. Sorge experienced these symptoms during the termination meeting and in the week before he began working at Impact. [Id., p. 254:14-21, Ex. 3.]

**Response: Admitted.**

## ADDITIONAL STATEMENTS OF FACT

92.     Yelp has an explicit "no tolerance" policy against harassment in the workplace. Sorge Decl. ¶ 44 & Ex. B.

93.     The policy states, in relevant part:

We do not tolerate harassment or discrimination based on sex, including pregnancy, childbirth, breastfeeding or related medical conditions; race; religious creed; color; gender, gender identity or gender expression; national origin or ancestry; physical or mental disability; medical condition; marital or registered domestic partner status; age; genetic information; military or veteran status; sexual orientation; denial of family and medical care leave; or any other basis protected by federal, state or local law or ordinance or regulation.

We prohibit harassment, discrimination, and retaliation at all levels of the organization, and our policy extends to harassment of or by users, advertisers, vendors, independent contractors and other third parties involved in our operations. It also extends to harassment based on the perception that someone has any of the characteristics listed above, or is associated with a person who has or is perceived as having any of those characteristics.

Prohibited harassment includes, but is not limited to, the following behavior:



18

• Threats and demands, whether explicit or implicit, to submit to sexual requests as a condition of continued employment, or to avoid some other loss and offers of employment benefits in return for sexual conduct;

• Verbal conduct such as epithets, derogatory jokes or comments, slurs or unwanted sexual advances, invitations or comments;
• Visual displays such as derogatory and/or sexually-oriented posters, photography, cartoons, drawings or gestures or similarly offensive emails, IM messages webpages, or other digital communications;

• Physical conduct including assault, unwanted touching, intentionally blocking normal movement or interfering with work because of sex, race or any other protected basis;

• Retaliation for reporting or threatening to report harassment.

***Complaint Procedure.*** If you believe you have witnessed or experienced unlawful harassment, discrimination or retaliation, it is your responsibility to report it to your manager, Human Resources or any department head. Managers, in particular, who observe or have knowledge of conduct they believe could be harassing are required to report the conduct or situation to Human Resources.

94.     Despite the clear wording of this policy, Yelp <u>denied</u> that using the word "faggot" or references to female genitalia and menstrual cycles in the workplace would be forbidden under its "no tolerance" policy.  Sorge Decl. ¶ 47, Ex. E.

95.     Among other things, Yelp left out of its recitation of material facts the contention that Joseph Sorge first complained about the offensive song to Matthew Susa his manager on June 16, 2016.  Sorge Decl. ¶ 14-16.

96.     The reason Yelp listed on its official termination paperwork for Sorge (dated June 17, 2016) was "Not a good Cultural Fit."  Sorge Decl. ¶ 45, Ex. C (Yelp000082).

97.     Susa had specifically referenced the "culture" of Yelp as a reason for rejecting Sorge's complaint regarding the offensive song on June 16, 2016. Sorge Decl. ¶ 15.



Dated this 25th day of February, 2019,

JOSHUA CARDEN LAW FIRM, P.C.

By: s/Joshua W. Carden
Joshua W. Carden
*Attorneys for Plaintiff*
*Joseph Sorge*

