# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Joseph Sorge, | No. CV-17-04518-PHX-SMM |
| Plaintiff, | **ORDER** |
| v. | |
| Yelp Incorporated, | |
| Defendant. | |

Before the Court is Defendant Yelp Inc.'s Motion for Summary Judgment. (Doc. 29.) The motion has been fully briefed and is ripe for review. (Docs. 29-30, 39-40, 45.) For the reasons that follow, the motion will be granted in part and denied in part.

**I.    BACKGROUND**

On June 6, 2016, Plaintiff Joseph Sorge began working as an Associate Account Executive Trainee at Yelp Inc.'s ("Yelp") Scottsdale, Arizona location. (Pl.'s Statement of Facts, Doc. 39 ("PSOF") at 1.) His employment was terminated two weeks later on June 17. (Id. at 10.)

Sorge's primary responsibility at Yelp was to build relationships and sell advertising to local business customers. (Id. at 1.) On Sorge's first day, Yelp assigned him to a sales team with approximately 10 other trainees who started on the same day. (Id.) Sorge reported to Sales Manager Matthew Susa. (Id.) During his first week of employment, Sorge spent a majority of his work time in training and learning Yelp's sales techniques and

procedures. (Id. at 2.) Sorge learned about various reports and information that Yelp required trainees to enter on a daily basis. (Id.) In his second week, Sorge continued training classes and also worked on building relationships and making sales to customers. (Id.)

At the time of Sorge's employment, there were approximately six to eight sales teams on Sorge's sales floor. (Id.) The teams were permitted to select a team name and a team song that would occasionally play for approximately 10 to 30 seconds on the sales floor to celebrate a sale by the sales team. (Id.) One team, the "Razz Daddies," selected "Straight to the Bank" (the "Song") as their team song. (Id. at 12.) The parties dispute how often the Song was played during the work day. Sorge contends that it played anywhere from 5 to 20 times a day. (Doc. 30-1 at 71.)

Sorge found two lyrics in the Song offensive. First, the song opened with the words, "I'm in my Lambo, faggot." (Id.) Sorge was offended by use of the word "faggot" because it is hate speech toward a particular sexual orientation and Sorge has friends and family that are gay. (Id. at 71, 88.) The Song also included the line, "Homey, you're a bitch. You've got feminine ways. You've got four lips and bleed for seven days." (Id. at 71.) Sorge found this line to be offensive to women. (Id.) Sorge does not identify as a homosexual or a woman. (PSOF at 13.)

Sorge alleges that he complained about the Song to Susa on June 16, 2016.[1] (Doc. 39-1 at 2.) According to Sorge, he told Susa the Song was highly offensive and denigrating to homosexuals and women. (Doc. 30-1 at 104.) Susa responded by saying "it [was] company culture to play songs after a team sells to business owners" and that Sorge should "get over it" or words to that effect. (Doc. 39-1 at 2.) Sorge was terminated the following day. (PSOF at 10.)

Yelp contends it terminated Sorge for his "unprofessional and disrespectful behavior." (Doc. 45 at 9.) According to Yelp, as Sorge began to focus on sales in his second week of employment, Susa observed that Sorge repeatedly failed to follow specific

---

[1] Susa denies that Sorge raised any concerns regarding offensive music prior to his termination. (Doc. 30-1 at 8.) For purposes of summary judgment, the Court assumes the conversation occurred as Sorge recounts.

- 2 -

techniques and procedures required by Yelp. (Doc. 30 at 2.) On June 14, Susa met with Sorge to coach him on the importance of following Yelp processes. (PSOF at 3.) Susa followed up the conversation with an email. (Doc. 30-1 at 10.) On the same day, Susa observed that Sorge had failed to complete Yelp's daily sales metrics documents. (Doc. 30 at 3.) This document required trainees to enter their individual data covering calls made and appointments set. (PSOF at 3.) Despite receiving verbal reminders and calendar invites from Susa, Sorge failed to enter the required data three times in a row, including at the end of the day on June 13, and at lunch and the end of the day on June 14. (Id. at 4.) Susa sent Sorge an email reminding Sorge of these requirements and asking if anything was getting in the way of him completing the tasks. (Doc. 30-1 at 15.) Sorge replied "Good to go." (Id.)

On June 15, Susa reached out to his direct supervisor, Senior Sales Manager Abby Kennedy, to discuss Sorge's repeated failures to follow Yelp's processes and procedures and his failure to improve. (PSOF at 5; Doc. 30-1 at 18.) The email notes that Sorge was not recording vetting notes or updating his vetting list as required and that he was disregarding the processes and feedback Susa had given him. (Doc. 30-1 at 18.)

On the morning of June 16, Kennedy joined Susa for a coaching session with Sorge. (PSOF at 5.) They discussed Sorge's failure to complete the metrics document on a daily basis and his failure to follow Yelp's procedure for vetting potential clients. (Id.) Susa and Kennedy perceived Sorge to act disrespectfully and resistant to their coaching. (Doc. 30-1 at 5-6, 23.) According to Kennedy and Susa, Sorge laughed, interrupted them, and referred to Susa's instruction as "you guys and your practices." (Id.) Sorge denies that he was disrespectful and believed any laughing during the meeting was congenial. (Doc. 39-1 at 3.) Kennedy and Susa also state that Sorge asked why Kennedy was present for the meeting and told Susa that he would prefer that she was not present for future meetings. (Doc. 30-1 at 6, 23.) Sorge denies this occurred. (Doc. 39-1 at 3.) Following the meeting, Kennedy summarized these observations for Senior Manager Marla Castaneda in an email and sought her insight. (PSOF at 6; Doc. 30-1 at 30-31.) The email noted that the meeting was "alarming to say the least." (Doc. 30-1 at 30.)

That same afternoon, Sorge attended a team-wide training event. (Doc. 39-1 at 2.) During the meeting, the Sales Director for the Scottsdale location, Heyward McAlpin, gave a presentation. (PSOF at 7.) Kennedy also attended the meeting. (Id.) Kennedy observed Sorge slouching in his chair, leaning back in his chair, putting his head down, not taking notes, and generally ignoring the presentation. (Doc. 30-1 at 23-24.) Sorge concedes that he may not have appeared in "peak state" but attributes that to his frustration with Susa's response to his complaint about the Song and to being exhausted from having "[his] ears assaulted multiple times a day that week by the offensive song." (Doc. 39-1 at 2-3.) He denies that he was ignoring the presentation and contends that note-taking was not required. (Id. at 2.)

At the conclusion of the training session, at approximately 4:10 p.m., Sorge exited the building through the entry doors, passing the area where interview candidates usually wait. (PSOF at 7-8.) Kennedy was later informed by Facilities Coordinator Randall Meagher and his supervisor, Carmine Verderame, that when Sorge was exiting the building, he turned to Meagher, who was sitting in a chair where interview candidates usually wait, and said to him, "Run while you can," or words to that effect. (Doc. 30-1 at 24.) Two other Yelp employees, Heather Webb and Amber Sutton, also reported witnessing Sorge's statement and recorded these observations in emails on June 17. (Id. at 24, 32-38.) Webb told Kennedy that she assumed Sorge made the comment to Meagher because he believed Meagher was an interview candidate.[2] (Id. at 24, 147.) Sorge denies saying anything to Meagher or anyone else as he left that day. (Doc. 39-1 at 3.)

Kennedy immediately informed Susa and McAlpin of Meagher and Webb's account of Sorge's statement. (Doc. 30-1 at 6, 24.) Kennedy and Susa then discussed with McAlpin Sorge's behavior over the past week, including his alleged comments to Meagher, and recommended that Yelp terminate Sorge. (Id.) McAlpin approved the termination that

---

[2] Sorge objects to Kennedy's declaration recounting how Sorge's comments were reported to her, arguing that Kennedy's report of others' statements is hearsay. (PSOF at 8.) However, Kennedy does not offer their statements for their truth but rather to show what she believed occurred at the time she and Susa were considering Sorge's termination. Therefore, Sorge's objection is overruled.

- 4 -

1 evening. (Id.)

2 On the morning of June 17, Susa and Human Resources Representative Nicole Berger met with Sorge. (PSOF at 10.) They informed him that his employment was terminated, effective immediately, because of his unprofessional and disrespectful conduct and failure to demonstrate improvement in following Yelp's processes and procedures. (Id.) Susa discussed the observations reported to him regarding Sorge's behavior at the McAlpin training session[3] and his comments to Meagher as he left. (Doc. 30-1 at 7, 70.) He stated that the final reason for Sorge's termination was the comment made to Meagher. (PSOF at 11.) The formal paperwork documenting Sorge's termination states that the primary reason for his termination was "Not a good [*sic*] Cultural Fit." (Doc. 39-1 at 12.)

At the meeting, Sorge complained that he experienced a hostile work environment at Yelp because he found the Song playing multiple times per day highly offensive, and he stated that his termination felt like retaliation for discussing the Song with Susa. (Doc. 30-1 at 70-71.) Sorge also complained that Susa used the "F-word" frequently when addressing Sorge and his teammates. (PSOF at 11; Doc. 39-1 at 4.) Sorge then stated that he would likely take legal action because he believed he was being retaliated against. (Doc. 30-1 at 82.)

On December 5, 2017, Sorge filed suit against Yelp in federal district court alleging that he suffered sexual harassment and retaliation in violation of Title VII of the Civil Rights Act of 1964. (Doc. 1.) Sorge states two causes of action: (1) Yelp created and fostered a hostile work environment by playing loud, offensive music demeaning to women and homosexuals; and (2) Yelp retaliated against Sorge by immediately terminating him after he engaged in the protected activity of complaining about the hostile work environment created by the Song. (Id. at 4-5.) Yelp now moves for summary judgment on each of Sorge's claims. (Doc. 29.)

. . . .

---

[3] Sorge highlights that during the termination meeting, Susa initially stated that he personally saw Sorge not paying attention or taking notes at the McAlpin training. (PSOF at 10; Doc. 30-1 at 70.) When Sorge noted that Susa was not at the training, Susa then stated that someone told him about it. (Doc. 30-1 at 70.)

- 5 -

## II. LEGAL STANDARD

"A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought." Fed. R. Civ. P. 56(a). A court must grant summary judgment if the pleadings and supporting documents, viewed in the light most favorable to the nonmoving party, show "that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Id.; see Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Jesinger v. Nev. Fed. Credit Union, 24 F.3d 1127, 1130 (9th Cir. 1994). Substantive law determines which facts are material. See Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986); see also Jesinger, 24 F.3d at 1130. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 248. The dispute must also be genuine, that is, the evidence must be "such that a reasonable jury could return a verdict for the nonmoving party." Id.; see Jesinger, 24 F.3d at 1130. The court will determine whether a genuine issue of material fact exists through the "lens of the quantum of proof applicable to the substantive claim at issue." Steven Baicker-McKee et al., Federal Civil Rules Handbook 1104 (Thomson Reuters 25th ed. 2018); see Anderson, 477 U.S. at 254.

A principal purpose of summary judgment is "to isolate and dispose of factually unsupported claims." Celotex, 477 U.S. at 323-24. Summary judgment is appropriate against a party who "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Id. at 322; see also Citadel Holding Corp. v. Roven, 26 F.3d 960, 964 (9th Cir. 1994). The moving party need not disprove matters on which the opponent has the burden of proof at trial; instead, the moving party may identify the absence of evidence in support of the opposing party's claims. See Celotex, 477 U.S. at 317, 323-24. The party opposing summary judgment need not produce evidence "in a form that would be admissible at trial in order to avoid summary judgment." Id. at 324. However, the opposing party "may not rest upon the mere allegations or denials of [the party's] pleadings, but . . . must set forth

specific facts showing that there is a genuine issue for trial." See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986) (quoting Fed. R. Civ. P. 56(e) (1963) (amended 2010)).

**III.   ANALYSIS**

Yelp moves for summary judgment on Sorge's claims for hostile work environment and retaliation. (Doc. 29 at 6-16.) It also moves for summary judgment on Sorge's claim for damages. (Id. at 16-18.) The Court discusses each claim in turn.

**A. Hostile Work Environment**

Yelp argues it is entitled to summary judgment on Sorge's hostile work environment claim because Sorge is a heterosexual man and, therefore, cannot show that he experienced sexual harassment because of his sex when listening to lyrics that were offensive to homosexuals and women. (Doc. 29 at 7.) Yelp further contends that even if taken as true, the conduct Sorge complains of was neither sufficiently severe nor pervasive to create a hostile work environment that is actionable under Title VII. (Id. at 10.) Because the Court finds Sorge cannot show that he was sexually harassed because of his sex, the Court does not reach whether the alleged harassment was severe or pervasive.

Under Title VII, it is unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1). This prohibition "extends to the creation of a hostile work environment." Fuller v. Idaho Dep't of Corr., 865 F.3d 1154, 1161 (9th Cir. 2017) (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993)). To establish a claim for hostile work environment, the plaintiff must show that: "(1) she was subjected to verbal or physical conduct of a sexual nature, (2) this conduct was unwelcome, and (3) the conduct was sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Craig v. M & O Agencies, Inc., 496 F.3d 1047, 1055 (9th Cir. 2007) (quoting Fuller v. City of Oakland, 47 F.3d 1522, 1527 (9th Cir. 1995)). Additionally, a hostile work environment claim is actionable only to the extent the harassment occurred "because of" the plaintiff's

sex. Nichols v. Azteca Rest. Enters., Inc., 256 F.3d 864, 874 (9th Cir. 2001) (citing Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 79 (1998)); 42 U.S.C. § 2000e-2(a)(1) (prohibiting discrimination in conditions of employment "because of [claimant's] . . . sex")

Sorge identifies as a heterosexual man, but he complains of a work environment hostile to women and homosexuals. Because Sorge is neither a woman nor homosexual, his complaints about the Song cannot support a claim for hostile work environment as he has not experienced harassment because of *his own* sex. See Nichols, 256 F.3d at 874; see also Patee v. Pac. Nw. Bell Tel. Co., 803 F.2d 476, 478 (9th Cir. 1986) (holding group of men did not have standing to bring a discrimination claim on behalf of female co-workers).

Sorge's arguments in support of this claim are unavailing. First, Sorge argues that the context of the Song's lyrics makes it clear that the rapper is actually using offensive language to insult a heterosexual man and Sorge, thus, experienced harassment on the basis of his sex as a heterosexual man. (Doc. 40 at 4.) This is a rewriting of Sorge's claim. The Complaint clearly states that Yelp created "a pervasive hostile work environment that tolerates . . . music demeaning to women and homosexuals." (Doc. 1 at 4.) At no point does Sorge allege that the Song was demeaning to heterosexual men. Sorge will not be permitted to amend the theory of liability stated in his Complaint in opposition to summary judgment. See Coleman v. Quaker Oats Co., 232 F.3d 1271, 1292-93 (9th Cir. 2000) (holding plaintiff could not present new theory of liability in opposition to summary judgment).

Next, Sorge points to Yelp's own "no tolerance" policy, stating that the lyrics of the Song violated the policy and that the policy is written for the benefit of those associated with anyone in a protected class, not just those within a protected class. (Doc. 40 at 4.) This argument is irrelevant. Yelp's "no tolerance" policy does not alter the statutory requirements of Title VII, which requires that the discrimination occur because of the plaintiff's sex. Sorge does not identify any case law stating otherwise.

Sorge's next argument is similarly irrelevant. Sorge argues that "hostile environment cases based on sex do not require evidence that the treatment was motivated by sexual desire and the treatment need not to be sex specific." (Doc. 40 at 5 (emphasis in

original) (citing Zetwick v. Cnty. of Yolo, 850 F.3d 436, 446 (9th Cir. 2017)).) This statement is true but does not advance Sorge's cause. The shortcoming in Sorge's claim is not that it is not "sex specific"; the fault is that Sorge does not belong to the protected class that was the subject of the offensive lyrics.

Sorge also quotes at length from the Supreme Court's decision in Oncale v. Sundowner Offshore Servs., Inc., to argue that men are protected from sexually hostile work environments under Title VII. (Doc. 40 at 6-7.) This is true but, once again, irrelevant to the question before the Court. The critical issue is "whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed." Id. at 80 (1998) (citing Harris, 510 U.S. at 25 (Ginsburg, J., concurring)). Sorge has alleged that women and homosexuals were subject to disadvantageous terms or conditions, and Sorge is not a member of either class. Therefore, the statutory terms of Title VII bar Sorge from bringing this claim.

Finally, Sorge argues that the "zone of interests" protected by Title VII encompasses his claim regardless of his sex or sexual orientation. (Doc. 40 at 5.) In support of this argument, Sorge points to the Supreme Court's decision in Thompson v. N. Am. Stainless, LP, 562 U.S. 170 (2011). In Thompson, the Supreme Court addressed who has standing to bring a retaliation claim under Title VII. Under Title VII, "a civil action may be brought . . . by the person claiming to be aggrieved." 42 U.S.C. § 2000e-5(f)(1). The Thompson Court held that the term "aggrieved" incorporates the "zone of interests" test applied in suits brought under the Administrative Procedure Act, 5 U.S.C. § 551 *et seq*. 562 U.S. at 178. The Court was merely interpreting the standing provision of Title VII; it did not alter the statutory requirements of any claims under Title VII. Therefore, even if Sorge's claim falls within the zone of interests protected by Title VII, a question the Court does not reach here, he still cannot satisfy the element of a hostile environment claim requiring that the discrimination occur because of his sex. See Nichols, 256 F.3d at 874.

Therefore, because Sorge cannot show that the alleged discrimination occurred because of his sex, summary judgment is proper on Sorge's claim for hostile work

1 environment.

2 **B. Retaliation**

3   Yelp also moves for summary judgment on Sorge's retaliation claim, arguing that Sorge cannot make a prima facie case of retaliation; it has proffered evidence of legitimate, non-retaliatory reasons for Sorge's termination; and Sorge cannot demonstrate Yelp's reasons are pretextual. (Doc. 29 at 14.)

   A plaintiff may use the *McDonnell-Douglas* burden-shifting framework to establish a retaliation claim. Cornwell v. Electra Cent. Credit Union, 439 F.3d 1018, 1035 (9th Cir. 2006) (citing Yartzoff v. Thomas, 809 F.2d 1371, 1375 (9th Cir. 1987)). First, "[t]o establish a prima facie case of retaliation, a plaintiff must demonstrate: (1) a protected activity; (2) an adverse employment action; and (3) a causal link between the protected activity and the adverse employment action." Id. at 1034-35 (9th Cir. 2006) (citing Steiner v. Showboat Operating Co., 25 F.3d 1459, 1464 (9th Cir. 1994)). Once the plaintiff has made a prima facie case, the burden then shifts to the defendant "to advance legitimate, non-retaliatory reasons for any adverse actions taken." Steiner, 25 F.3d at 1464. To meet its burden, the defendant "must offer evidence that the adverse action was taken for other than impermissibly discriminatory reasons." Wallis v. J.R. Simplot Co., 26 F.3d 885, 889 (9th Cir. 1994) (citing Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 254 (1981)), as amended on denial of reh'g (July 14, 1994).

   If the defendant meets its burden of production, "the plaintiff bears the ultimate burden of demonstrating that the reason was merely a pretext for a discriminatory motive." Ray v. Henderson, 217 F.3d 1234, 1240 (9th Cir. 2000) (citing Steiner, 25 F.3d at 1464-65). The plaintiff can satisfy this burden by producing direct or circumstantial evidence of retaliatory motive, but "[m]erely denying the credibility of the employer's proffered reasons is insufficient to withstand summary judgment." Munoz v. Mabus, 630 F.3d 856, 865 (9th Cir. 2010) (citing Lindsey v. Shalmy, 29 F.3d 1382, 1385 (9th Cir. 1994)).

   Sorge alleges that his termination was retaliation for complaining about the Song's lyrics to Susa. (Doc. 1 at 4-5.) Yelp argues that Sorge cannot establish a prima facie case

- 10 -

of retaliation. Specifically, Yelp argues Sorge cannot demonstrate that he engaged in a protected activity for the same reason his hostile work environment claim failed: Sorge is a heterosexual man. (Doc. 29 at 13-14.) However, Yelp's argument misconstrues what constitutes a protected activity for purposes of a retaliation claim. An employee need not prove an "unlawful employment practice" to prevail on a claim of unlawful retaliation; rather, "the opposed conduct must fairly fall within the protection of Title VII to sustain a claim of unlawful retaliation." Learned v. City of Bellevue, 860 F.2d 928, 932 (9th Cir. 1988) (citing Silver v. KCA, Inc., 586 F.2d 138, 142 (9th Cir. 1978)). "Furthermore, an employee's complaints about the treatment of others is considered a protected activity, even if the employee is not a member of the class that he claims suffered from discrimination, and even if the discrimination he complained about was not legally cognizable." Ray, 217 F.3d at 1240 n.3 (citing Moyo v. Gomez, 40 F.3d 982 (9th Cir. 1994)). Thus, Sorge's alleged complaint about the Song is not excluded from protection under Title VII's retaliation provision merely because Sorge is not a woman or a homosexual. Because Yelp makes no further arguments against Sorge's prima facie case, the Court assumes, without finding, that Sorge has established his prima facie case.

Yelp, in turn, has carried its burden of production and provided adequate evidence of a legitimate, non-retaliatory reason for Sorge's termination. Yelp states that it terminated Sorge for his "unprofessional and disrespectful behavior," his failure to follow Yelp processes, and his "Run while you can" comment to Meagher. (Doc. 29 at 14.) Yelp has provided thorough contemporaneous documentation of Sorge's supervisors' belief that Sorge was acting disrespectfully and that Sorge made the comment to Meagher. (Doc. 30-1 at 10-20, 28-37.)

Sorge challenges the accuracy of his supervisors' belief, arguing that he did not make the comment to Meagher and his supervisors misinterpreted or misrepresented his behavior. (See generally PSOF.) However, in judging the legitimacy of proffered non-retaliatory reasons, "it is not important whether they were *objectively* false." Villiarimo v. Aloha Island Air, Inc., 281 F.3d 1054, 1063 (9th Cir. 2002) (emphasis in original). "Rather,

courts only require that an employer honestly believed its reason for its actions, even if its reason is foolish or trivial or even baseless." Id. at 1063 (internal quotations omitted) (citing Johnson v. Nordstrom, Inc., 260 F.3d 727, 733 (7th Cir. 2001)). Sorge provides no evidence that his supervisors did not honestly believe that he was behaving disrespectfully or that he made the comment to Meagher. Therefore, Yelp has provided enough evidence to proffer a legitimate, non-retaliatory reason for Sorge's termination.

In response, Sorge argues that, despite Yelp's evidence of a legitimate, non-retaliatory reason, his retaliation claim should go to a jury because of the temporal proximity between his complaint to Susa about the Song and his termination approximately 24 hours later. (Doc. 40 at 8-9.) While unclear if Sorge offers this evidence to support his prima facie case or as evidence of pretext, the Court considers it in the context of pretext here. See Miller v. Fairchild Indus., Inc., 885 F.2d 498, 505 n.8 (9th Cir. 1989) (citing Burdine, 450 U.S. at 255 n.10; Miller v. Fairchild Indus., Inc., 797 F.2d 727, 732 (9th Cir. 1986) (noting that "[t]o show pretext, a plaintiff may rely on evidence offered to establish the prima facie case"), as amended on denial of reh'g and reh'g en banc (Sept. 19, 1989).

The Ninth Circuit Court of Appeals has held that "[i]n some cases, temporal proximity can by itself constitute sufficient circumstantial evidence of retaliation for purposes of both the prima facie case and the showing of pretext." Dawson v. Entek Int'l, 630 F.3d 928, 937 (9th Cir. 2011) (citing Bell v. Clackamas Cty., 341 F.3d 858, 865-66 (9th Cir. 2003); Miller, 797 F.2d at 731-32); see also Passantino v. Johnson & Johnson Consumer Prod., Inc., 212 F.3d 493, 507 (9th Cir. 2000) (citing Strother v. S. Cal. Permanente Med. Grp., 79 F.3d 859, 870-71 (9th Cir. 1996)) (noting "evidence based on timing can be sufficient to let the issue go to the jury, even in the face of alternative reasons proffered by the defendant"). In at least two cases, the Ninth Circuit has found that a very close temporal proximity between a protected activity and an adverse action, without further circumstantial evidence of retaliatory intent, is sufficient to raise a jury question as to pretext. In Dawson v. Entek Int'l, the Ninth Circuit held that two days between the plaintiff's protected activity and discharge was sufficient to raise a triable issue of fact. 630

F.3d at 937. Similarly, in Kerr v. Jewell, the Ninth Circuit held that a temporal proximity of less than a month's time, without more, "provide[d] a sufficient basis from which to infer pretext." 549 F. App'x 635, 639 (9th Cir. 2013) (citing Dawson, 630 F.3d at 937). Although the Ninth Circuit has warned against a mechanical and simplistic application of the temporal proximity criterion, see Coszalter v. City of Salem, 320 F.3d 968, 977-78 (9th Cir. 2003), the holdings in Dawson and Kerr provide no guidance as to when a similar temporal proximity would be insufficient to infer pretext without further circumstantial evidence. Therefore, the Court is compelled to conclude that the temporal proximity of 24 hours between Sorge's alleged complaint and his termination is sufficient to raise a triable issue as to pretext.

Additionally, according to Ninth Circuit law, a reasonable jury could potentially find evidence of retaliatory intent in Susa's response to Sorge's complaint and Yelp's formally stated reason for Sorge's termination. (See Doc. 40 at 9-10.) Sorge alleges that when he complained to Susa about the offensive lyrics, Susa responded by saying "it [was] company culture" and that Sorge should "get over it." (Doc. 39-1 at 2.) Then on the formal paperwork documenting Sorge's termination, Yelp noted that the primary reason for Sorge's termination was "Not a good [sic] Cultural Fit." (Id. at 12.) Susa's response to Sorge's complaint suggests, at the very least, that Susa was not open to Sorge's complaint, and the parallel between the formally documented reason for Sorge's termination and Susa's response could suggest a connection between Sorge's complaint and his termination.[4] Standing alone, this connection would not constitute "specific" and "substantial" circumstantial evidence sufficient to defeat a motion for summary judgment.

---

[4] Sorge also argues that Yelp gave shifting or changing reasons for its actions, from which a fact-finder could infer retaliatory intent. (Doc. 40 at 11.) Sorge notes that the reasons Yelp offers here for his termination are different than the reason stated in his termination paperwork, which stated that he was "Not a good [sic] Cultural Fit." (Id.) However, this argument is a misrepresentation of the record. Sorge does not dispute that at the time of his termination he was informed orally that he was being terminated for his unprofessional and disrespectful conduct, for his failure to follow Yelp's processes and procedures, and for the comments he made to Meagher. (PSOF at 10-11.) These are the same reasons Yelp offers here for Sorge's termination. The statement that Sorge was not a good cultural fit in his termination paperwork does not contradict, but rather encompasses, each of these reasons.

See Winarto v. Toshiba Am. Elecs. Components, Inc., 274 F.3d 1276, 1284 (9th Cir. 2001) (quoting Godwin v. Hunt Wesson, Inc., 150 F.3d 1217, 1222 (9th Cir. 1998)) (noting circumstantial evidence of pretext must be "specific" and "substantial"). However, it does add some, albeit limited, support for inferring a retaliatory motive in light of the close temporal proximity between Sorge's complaint and his termination. For these reasons, the Court will deny Yelp's motion for summary judgment as to Sorge's retaliation claim.

**C. Damages**

Yelp also moves for summary judgment on Sorge's claim for damages. (Doc. 29 at 16-18.) Sorge seeks $300,000 in compensatory and punitive damages and $5,600 in lost wages for 8 weeks of unemployment in the 12 months following his termination. (Doc. 30-1 at 169.)

Yelp first moves for summary judgment on Sorge's claim for back pay, arguing Sorge cannot provide evidence of his entitlement to back pay. (Doc. 29 at 16-17.) While Sorge did not respond to Yelp's damages argument, there is sufficient evidence in the record to create an issue of fact as to Sorge's entitlement to back pay. Sorge was terminated from Yelp on June 17, 2017, and began employment with Impact Payments Recruiting ("Impact") a week later on June 28, 2016. (PSOF at 16.) Sorge's starting salary at Impact was $40,000, which was higher than his salary of $30,000 at Yelp. (PSOF at 17.) Sorge voluntarily resigned from Impact on September 16, 2016. (Id.) Then, beginning on October 24, 2016, Sorge worked at The Lucas Group for approximately one week before Sorge was involuntarily terminated. (Id.) Sorge does not identify his salary at The Lucas Group. Nor does he provide evidence of being employed or unemployed following his termination from The Lucas Group.

Based on these facts, Sorge could potentially be entitled to back pay for the one week of unemployment between his termination at Yelp and subsequent employment at Impact and the five weeks of unemployment between his leaving Impact and starting at The Lucas Group. There is no further evidence supporting Sorge's claim for an additional two weeks of unemployment. Therefore, Sorge may only seek back pay for a total of six

weeks, rather than eight.

However, Yelp argues that Sorge should be prohibited from obtaining back pay for any unemployment following his voluntarily resignation from Impact because Impact paid a higher salary. (Doc. 29 at 17.) Yelp contends voluntarily resignation from a higher paying position should cut off entitlement to back pay. (Id. (citing Palasota v. Haggar Clothing Co., 499 F.3d 474, 486 (5th Cir. 2007)).) Although framed differently by Yelp, the critical question Yelp presents is whether Sorge was mitigating his damages when he voluntarily resigned.

A Title VII plaintiff seeking back pay has "a duty to mitigate damages by seeking alternative employment with 'reasonable diligence.'" Caudle v. Bristow Optical Co., 224 F.3d 1014, 1020 (9th Cir. 2000) (quoting 42 U.S.C. § 2000e-5(g)(1) (1994)), as amended on denial of reh'g (Nov. 2, 2000). The plaintiff "need not go into another line of work, accept a demotion, or take a demeaning position," but the plaintiff "forfeits his right to backpay if he refuses a job substantially equivalent to the one he was denied." Ford Motor Co. v. E.E.O.C., 458 U.S. 219, 231-32 (1982) (footnotes omitted). Yelp bears the burden of proving Sorge failed to mitigate his damages. See Odima v. Westin Tucson Hotel, 53 F.3d 1484, 1497 (9th Cir. 1995).

The Court finds Yelp has failed to carry its burden at this stage of litigation. Sorge stated in his deposition that he voluntarily resigned from Impact because of the distance of his commute and "a cultural clash with one of the owners." (Doc. 30-1 at 128.) Neither party addressed whether the position with Impact was "substantially equivalent" to Sorge's position with Yelp, especially in light of Sorge's stated reasons for leaving. Without this, the Court is unprepared to determine whether Sorge's resignation for these reasons constitutes a failure to mitigate his damages. Accordingly, the Court will not grant summary judgment as to Sorge's entitlement to back pay for the weeks between his resignation from Impact and his employment at The Lucas Group. It remains to be seen, however, whether Sorge may persuade a jury at trial that he is entitled to back pay for anything more than the one week between his Yelp and Impact positions.

Yelp also moves for summary judgment on Sorge's claim for emotional damages. (Doc. 29 at 17-18.) Yelp argues that because Sorge cannot offer evidence of medical records, counseling, or physical symptoms resulting from emotional distress he cannot show that he is entitled to emotional damages. (Id.) In making this argument, Yelp relies on two district court cases addressing the availability of damages in diversity-jurisdiction contract disputes. (Id. at 17 (citing Hastings v. Bank of Am. NA, No. CV-13-00834-PHX-DLR, 2014 WL 11514488, at *4 (D. Ariz. Dec. 9, 2014); Loza v. Am. Heritage Life Ins. Co., No. CV-09-01118-PHX-DGC, 2012 WL 1019033, at *8 (D. Ariz. Mar. 26, 2012)).) These cases have no relevance to the quantum of proof necessary to establish emotional damages in a federal employment-discrimination case. The Ninth Circuit has explicitly rejected any requirement for objective or substantial evidence of emotional damages in employment discrimination cases. See Zhang v. Am. Gem Seafoods, Inc., 339 F.3d 1020, 1040 (9th Cir. 2003); Passantino, 212 F.3d at 513. A plaintiff's personal testimony regarding even mild, non-physical forms of emotional distress is sufficient to support an award of emotional damages. Zhang, 339 F.3d at 1040 (9th Cir. 2003) (upholding a jury award for emotional-distress damages where plaintiff testified that his termination had killed his dream and damaged his reputation).

Sorge testified at his deposition that his termination was distressing and embarrassing and that he experienced overall disgust, "a sick-to-my-stomach feeling," and difficulty getting out of bed. (Doc. 30-1 at 113, 134.) He also suffered the stress of looking for a new job. (Id. at 114.) This is sufficient to survive a motion for summary judgment on his claim for emotional damages. See Zhang, 339 F.3d at 1040.

Therefore, Yelp's motion for summary judgment on Sorge's damages claim is granted only to the extent that Sorge is limited to seeking six weeks of back pay and may not seek back pay for any time following his employment at The Lucas Group.

## IV. CONCLUSION

Based on the foregoing, Yelp's motion for summary judgment will be granted in part and denied in part. Sorge's hostile work environment claim will be dismissed and his

claim for back pay will be limited to the six weeks of unemployment between his termination from Yelp and his employment at The Lucas Group. Sorge's claim for retaliation and other damages survive the motion for summary judgment.

Accordingly,

**IT IS HEREBY ORDERED granting in part and denying in part** Yelp Inc.'s Motion for Summary Judgment. (Doc. 29.)

**IT IS FURTHER ORDERED dismissing** Sorge's claim for hostile work environment.

**IT IS FURTHER ORDERED limiting** Sorge's damages claim for back pay to the six weeks of unemployment between his termination from Yelp and his employment at The Lucas Group.

**Dated** this 25th day of June, 2019.

Honorable Stephen M. McNamee
Senior United States District Judge